Filed 9/12/13

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B238535 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA064769) |
| v. | |
| JAMES AUSTIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Beverly O'Connell, Judge. Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Colleen M. Tiedemann and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, [[ ]].

In this case of first impression in California, we hold the trial court did not err by ruling a prosecution expert was qualified to testify a sexual assault victim could have experienced an orgasm during non-consensual oral copulation.

C.L., the 14-year-old victim in this case, was defendant and appellant James Austin's step-daughter. While Austin's wife was out of the country, Austin asked C.L. to sleep in his bed because he was lonely. Mutual massage eventually turned sexual as Austin began touching C.L.'s breasts, buttocks and vagina. He showed her pornographic videos. On four different occasions, he orally copulated her. C.L. testified she did not want Austin to be doing these things to her, but that she was afraid he would get angry if she refused. Austin had a bad temper, he kept guns in the house, and he warned C.L. if she revealed what he was doing she would be sent back to China, where she had been born. C.L. also testified that although she experienced orgasms when Austin orally copulated her, she did not enjoy it.

Austin was charged with a series of forcible and non-forcible sexual offenses, including oral copulation with a person under 16, forcible oral copulation, lewd act on a child, and attempted unlawful sexual intercourse (Pen. Code, §§ 288a, subd. (b) & (c)(2), 288, subd. (c)(2), 664, 261.5).[1] During opening statement, defense counsel told the jury Austin was guilty of all the non-forcible charges, but he was innocent of the forcible oral copulation charges. The prosecution theory was duress; the defense theory was reasonable belief in C.L.'s consent to the oral copulation.

Although the trial court initially ruled, reasonably in our view, that C.L.'s orgasms were not probative on the issue of her consent, the court later allowed this evidence on the ground the prosecution had opened the door. After C.L. testified she experienced an orgasm each of the four times Austin had orally copulated her, a prosecution expert testified an orgasm was merely a physiological reaction to physical stimulation. Asked if this meant a child could experience an orgasm while being sexually abused, the expert answered yes.

---

[1] All further references are to the Penal Code unless otherwise specified.

2

On appeal, Austin contends the expert was not qualified to give this testimony. We disagree. The expert, a Licensed Marriage and Family Therapist, was the clinical supervisor of a university-affiliated sexual assault treatment center and a specialist in the treatment of adolescent female sexual assault victims. As part of her education, the expert had received training in the biology and physiology of human sexual response. We hold the trial court did not err by ruling the expert was qualified to offer this testimony.

The judgment is affirmed.

**BACKGROUND**

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

C.L. was born in China in 1994, and defendant Austin is her step-father. After Austin married C.L.'s mother, they brought C.L. to the United States in 2005 when she was 11 years old. Before that, Austin lived with C.L. and her mother in China for about a year while they waited for C.L.'s visa application to be approved.

Starting in China, C.L.'s relationship with Austin was that of father-daughter. He taught her English and, when she came to the United States, he helped her with her homework and cooked for her and her mother. C.L. loved Austin as a father.

When they first moved to the United States, C.L. had her own bedroom. But her parents later rented out some of the rooms in their house, so C.L. moved into their bedroom. She had her own bed on one side of the room, located behind a partition.

At the beginning of 2009,[2] C.L.'s mother went on a trip to China. While she was away, Austin asked C.L. to sleep in his bed with him because he felt lonely. C.L. testified she complied "[b]ecause he would get really angry when I don't, and then he will start saying like 'Oh, my goodness, like I feel so lonely. Your mom's not here.' " In the mornings, they gave each other massages. C.L. was afraid to refuse the massages

---

[2]     All further date references are to the year 2009 unless otherwise specified.

because Austin "gets really angry and he gets really loud and the neighbors complain, and he carries a knife around. [¶] Also he has guns in the house, two huge ones under the bed, and he knows how to fire them . . . ." C.L. testified, "[W]e have [a] house that's in Lancaster that we also rent out, and one time he was going to Lancaster carrying his gun. [¶] So I was like 'Why are you carrying your gun?' [¶] And he's like 'Just in case that guy gets all crazy and I will just shoot him for self-defense.' "

Initially these were nothing more than routine massages. "The first few times it was just massage, but the time that really made me feel uncomfortable was the time that he asked me to take my shirt off so he can massage my whole back. [¶] So I thought to myself this is kind of weird, but . . . at the time I didn't really think . . . anything was wrong. Like in China, they give you massage. When you go [to] a massage place, you don't have your shirt on." Eventually, Austin started touching C.L.'s breasts, her buttocks and her vagina. He kissed her using his tongue. He showed her pornographic videos a few times. On four different occasions he orally copulated her. These acts occurred during two different trips C.L.'s mother made to China that year, one in January and one in April. C.L. testified she did not want Austin to be doing these things to her. She also testified she experienced orgasms when Austin orally copulated her, but she did not enjoy it.

C.L. did not tell her mother or anyone else about what Austin was doing. Asked why, C.L. testified: "Well, he was telling me – well, he wasn't like threatening me – I know that he is, but at the time I didn't think it was, because he put it in a different way."

On May 2, 2009, the last time Austin orally copulated her, he had come to bed naked the night before. When C.L. awoke the next morning, Austin was "touching" and "cuddling with" her. He touched her breasts and her vagina, and "he licked [her] vagina." After doing that, Austin stood up. Over her parents' bed there was a mirror on the ceiling. In the mirror, C.L. saw that Austin had his penis in his hand. He was "coming closer . . . and he was trying to put his penis in [her] vagina." C.L. told him to stop and Austin replied, " 'Oh, okay. I just wanted to feel you.' "

4

C.L. testified:

"A.  I got up and I told him that I don't want to do this anymore, and I don't feel comfortable and I don't think it's right.  [¶]  And then he said 'Yeah, I'll stop and we'll just go back to a father/daughter relationship.'

"Q.  Was that hard for you to do?

"A.  Yes, it was very hard.  I couldn't get my courage together to tell him.

"Q.  Before that?

"A.  Yeah.  I knew it was wrong, but I was just so scared, and I . . . wasn't very confident, and I didn't know what was going to happen because I didn't have any family in America, and it's not possible if I go back to China.  [¶]  And . . . I didn't know the law, and like I didn't know that he could get into so much trouble, like what if he's not in jail . . . ."

Asked why she waited so long to tell anyone what had been going on, C.L. testified Austin told her:  "[D]o not ever tell your mom, because if you have to tell your mom she is going to kill me and you're going to end up in China.  Do you want to go back to China?"  Austin also said, "[Your mom] can't survive here.  Like her English is not good enough, like she could never survive in America by herself.  It's not possible. She can't even get gas."

The following colloquy occurred:

"Q.  And were there any particular times where you were afraid of the defendant?

"A.  When he – yes.  He gets really, really angry and he gets really loud.

"Q.  And is this something that happened only when you turned 14, or is this the way he's kind of been since you've known him?

"A.  Well, he's gotten worse when I turned 14, but before that he was still very, very loud, and when him and my mom would get into an argument it's really, really loud and he will like scream and yell and his face gets all red."

5

On cross-examination, the following colloquy occurred:

"Q. He never physically forced you – he never restrained you physically or opened your legs physically, did he?

"A. Yes, he did.

"Q. He never . . . physically pried your legs open, did he?

"A. Yes, he did.

"Q. You never testified to that, did you?

"A. They never asked me."

The colloquy further continued:

"Q. You testified that you didn't know the law and you thought you had to comply?

"A. Yes.

"Q. And you never told him to stop until the last time, correct?

"A. Yes.

"Q. That's the only time you told him to stop; is that true?

"Q. Yes."

On May 9, C.L. told her martial arts instructor, Chad Moore, that Austin had been orally copulating her. She said it had happened four times over a six-month period, that things had not gone beyond oral sex, but Austin tried to have intercourse with her and she stopped him. She told Moore she was depressed and had thought about killing herself. Moore testified C.L. did not want Austin to find out she had talked about it. She told Moore, " . . . I don't want him to know. I am afraid. He has a bad temper. He has guns. I don't want him to shoot me." The authorities were notified and C.L. was placed in foster care.

Detective Rich Simmons spoke with Austin on May 12. Simmons falsely suggested the police had recovered DNA evidence that could prove sexual contact between Austin and C.L. Austin denied watching pornographic videos with C.L., but said there were adult videos in the house which she might have watched on her own. He denied there had been any inappropriate touching. He said C.L. occasionally fell

6

asleep in his bed while they were watching movies, but he would make her move to her own bed when she woke up.  When Simmons said C.L. had accused him of asking her to sleep in his bed when her mother was away, Austin said that was "a fabrication, pretty much."  According to Austin, C.L. "fell asleep a couple of times in the bed.  When we're watching movies, she fell asleep."  Sometimes he, too, fell asleep and it's possible he could have touched her "if I turned over and put my arm around her, or something like that . . . in my sleep."   He denied having ever never kissed C.L. in a "suggestive" way.

Simmons spoke to C.L. on May 13.  Subsequently, he arranged for her to make two "pretext" telephone calls to Austin, who was out of custody by that time.  During the first call, C.L. told Austin her mother had asked her to lie in order to protect him, "but . . . before I lie for you, I want to know why you did this to me."  Austin responded:  "I thought I was doing what you wanted," "I didn't want to hurt you," "I didn't know I was making you so unhappy," and "I'm so sorry."  When C.L. asked why he wanted to have a sexual relationship with her, Austin replied:  "Well, I was confused.  I thought you wanted to."

During the second phone call, C.L. asked what she should say to help him and Austin told her:  "[Y]ou just have to say that you exaggerated, and you made it up . . . because you were really unhappy 'cause your mom was in China, and you wanted your mom to come home, and you were mad at me."  Austin also said:  "[J]ust say you exaggerated, and . . . stuff that you were dreaming, you were telling it like it was real." "[Y]ou don't have to say much.  You . . . just say, 'I made it up.  I made it up.  Uh, it's not true.  Wasn't true.  I wanted my mom to come home from China.'  And then stop.  Don't say anything more than that . . . ."  "The less you say, the better, and then you shut up, after that."  "That's all I can tell you.  And don't tell them you talked to me."

Joyce Medley, a marriage and family therapist, testified about Child Sexual Abuse Accommodation Syndrome (CSAAS).  She said children often delay reporting sexual abuse due to feelings of helplessness and entrapment; that children can be afraid of how the report will affect their families.  Medley testified it was possible for a sexually abused child to experience an orgasm even if the sexual contact was unwanted:  "It is a purely

physiological reaction, and if the clitoris gets enough stimulation, there will be an orgasm." One of the coping mechanisms utilized by abused children is dissociation: "Frequently during sexual activity there can be a dissociation. The brain can go elsewhere, but the clitoris is right there."

2. *Defense evidence.*

Austin's biological daughter, Tamara, testified she had never experienced anything inappropriate while living with him.

## CONTENTS

1. The trial court erred by relieving defense counsel without giving Austin the choice of waiving a potential conflict of interest.

2. The trial court erred by admitting evidence of C.L.'s pretext phone calls to Austin.

3. The trial court did not properly respond to a jury question during deliberations.

4. CALCRIM No. 1193 incorrectly advised jurors they could consider the expert's testimony about CSAAS in determining C.L.'s credibility.

5. The CSAAS expert's testimony was improper because it went beyond the scope of her expertise.

6. The prosecutor committed misconduct by disparaging Austin during closing argument.

7. The prosecutor committed misconduct by vouching for C.L.'s honesty during closing argument.

8. There was cumulative error.

9. A request for juror identifying information should have been granted.

10. Austin's post-trial *Faretta* motion for self-representation was improperly denied.

8

## DISCUSSION

## [[Begin nonpublished portion.]]

1. *Trial court did not err by relieving defense counsel.*

Austin contends the trial court erred by relieving defense counsel without giving Austin the choice of waiving a potential conflict of interest. This claim is meritless.

      a. *Background*.

On May 6, 2010, prior to trial, the prosecutor informed trial judge Shari Silver and defense counsel Peter Swarth that she had just been given the recording of a jailhouse telephone call between Austin and his brother.[3] During this call, Austin made statements suggesting Swarth had encouraged him to persuade Tamara, his biological daughter, to try to talk C.L. and/or her mother about not testifying against him.

As the prosecutor described the recording: "The defendant made numerous statements that his attorney, Peter Swarth, said that Tamara . . . could be helpful in explaining to the victim's mom that the victim's mom has a right to refuse to allow her daughter to testify. [¶] That, and I quote: Peter told me to tell Tamara the total exposure of the case . . . is approximately 40 years . . . which the defendant explained that that's the rest of his life; that his life and death are in the hands of Tamara and/or the victim and the mother. The defendant also said that the judge is an ex-prosecutor and a female, the prosecutor is a female, and that the deck is stacked against him. [¶] And again, it said later on in the conversation that Peter suggested a serious talk with Tamara . . . about the case and what she can do to help."[4]

The prosecutor told the trial court she was not seeking Swarth's removal from the case because, if anything, she was worried that additional delay would give Austin more

---

[3]    This phone call was made on April 24, 2010.

[4]    Swarth's immediate response to this revelation was visceral: "I'm seriously creeped out by this. Very seriously creeped out, and outraged. [¶] So far, all that I've heard about is a conversation between a man in custody and his brother in Indiana. How dare the prosecutor bring this without giving me advance warning."

9

time to influence the witnesses: "[P]erhaps Tamara Austin has, in fact, been contacted and has, in fact, agreed to make attempts to try to dissuade the victim and/or the mother from testifying. [¶] And so . . . I would, at a minimum, ask . . . that you admonish [Austin] to cease and desist, and that his phone privileges be revoked."

On May 7, Swarth filed a motion to continue the trial, in which he stated: "Although I have worked diligently on preparing the Defendant's case, I will not be ready to proceed with the trial for the following reasons: [¶] There exists a conflict of interests [*sic*] between the Defendant and his counsel which requires that he obtain new representation, in order to proceed to trial. [¶] Based on the foregoing, I request a continuance to a date when new counsel can appear which is convenient for the court and counsel."

At the outset of the hearing on this motion to continue the trial, heard by Judge Robert Shuit, the following colloquy occurred:

"The Court: . . . Tell me why we're here. I read the [motion to continue]. It's a little light. So maybe you can just tell me what's going on.

"Mr. Swarth: I'll be happy to discuss my reasons for conflicting, Your Honor.

"The Court: Probably have to, because in order to rule on it, I've got to know."

The prosecutor then described the contents of the first jailhouse recording, and also announced the police had just given her a second jailhouse recording. The second recording[5] was of a phone call on May 3 between Austin and Tamara: "The defendant said to the daughter, and I quote as best I can, 'There are ethical reasons why Peter [i.e., Swarth] can't say some things that I can talk to you about, and I don't know if Peter explained that to you,' because apparently the daughter has had a phone conversation with Mr. Swarth. [¶] The defendant says, 'I'm begging you to come see me. I was hoping that this could all be avoided, and I really need you to come see me so I can talk to you. There are things that we can't talk about on the phone.' "

---

[5] The second recording had apparently been made on May 3, 2010.

Swarth responded to the prosecutor's comments by saying: "I would disagree with many parts of counsel's characterization of things, but I'm not disagreeing with her characterization, which she has not articulated specifically but which I believe is the undercurrent here, which is to suggest that I advised my client to do things . . . [t]hat essentially amount, in the prosecution's view, to witness tampering." The prosecutor reiterated her reluctance to ask for Swarth's removal: "I understand that there may be a conflict here, but I ask that it be looked at closely. Because if there is another continuance, that just gives Mr. Austin more time and more opportunity to try and dissuade the witness in this case." Swarth rejoined, "I would simply note that I'm not spending time arguing or countering counsel's characterization of what she thinks the tape shows in terms of criminal conduct. I would strongly disagree with her that there is any criminal conduct on the tape."

After listening to the first jailhouse recording, the judge met with Swarth outside the presence of both the prosecutor and Austin. At the outset of this in camera proceeding, Swarth said:

"Your Honor, I believe that that disk [i.e., the recording of the first jailhouse phone call] creates a conflict because, as you can hear at the start of the disk, my client is talking to his brother apparently trying to relate a conversation that I had with him regarding witnesses in the case, and he makes quite a bit of attribution. 'Well, Peter told me that if we do this, we can get this result.' [¶] The problem with that, as you heard, the district attorney, she's not being ambiguous about it at all. She is intending to characterize that as witness tampering, and that now makes me a cohort or a co-conspirator. I believe that's the way I'll be viewed before a jury. I won't be able to answer either on behalf of myself, which is not very important, but most importantly, on behalf of my client. [¶] I think that what is likely to happen is a jury will look at him, and if they're inclined at all to think that he's guilty, they'll look at me and say, yeah, he's got this sleazy lawyer who tried – you know, those dirty lawyers. They'll do anything. I think that would deprive him of due process and a fair jury."

11

The court responded: "I haven't yet asked your client, but I guess I probably should at some point, what is his position on this issue, in other words, on your seeking to withdraw basically on the eve of trial?" Swarth said he had discussed the matter with Austin, whom he described as "ambiguously upset about it. Obviously he would like to get the case going . . . . But . . . he understands the need to have counsel that is not colorable by the prosecutor, as I believe the prosecutor now wants to do with me. [¶] And I think . . . [his] only question is I don't know whether I have enough money left to hire replacement counsel or whether [I need] the public defender, and he would like me to try and help him there."

The judge told Swarth: "I'm inclined to go ahead and find the conflict to be genuine. . . . [I]t does appear that there's a conflict insofar as your credibility will become an issue for the jury, and it's always difficult for an attorney to argue their own credibility to the jury." "That's a tough thing to overcome if you have to argue your own credibility, so I understand the predicament you're in and I understand why you didn't bring it to [the] court's attention earlier."

At this point, the hearing continued with all the parties present. Judge Shuit said: "I'm satisfied after speaking to [Swarth] and listening to the audiotape that there is a conflict that requires him to withdraw, and so I will allow him to do so." The judge then told Swarth: "I should point out that I'm not relieving you as of this moment. Of course, you are going to remain his lawyer until the new lawyer steps in, because the conflict is as to your ability to try the case, not to represent him."

On May 10, the parties were back before Judge Silver. In catching her up on what had occurred during her absence on May 7, Swarth said: "[A]fter listening to the discovery that was . . . disclosed on Thursday, I believed that there was a conflict, so I filed a [motion to continue trial] on Friday. That was heard by Judge Giss who deferred to Judge Schuit for the finding as to whether or not conflict was real enough to allow the continuance."

12

Later in the hearing, the following colloquy occurred:

"The Court:  . . . Mr. Austin, you seem upset over your trial being continued. Listen to me.  Don't speak.  Listen.  [¶]  Mr. Swarth, who's been your attorney, has been relieved by law because of a conflict.  The prosecution intends to bring out in your trial the issue of witness tampering.  [¶]  In the statement that I read, and what the attorneys tell me, you had made statements to the effect that Mr. Swarth advised you to do that. And that created the conflict because the jury may hear that your witness tampering was instructed by your own attorney.  And, as Mr. Swarth has said, he . . . will lose credibility in front of the jury.

"The Defendant:  I understand the issue, ma'am.

"The Court:  Just wait.  Just wait.  [¶]  I absolutely, as a matter of law, cannot allow Mr. Swarth to continue to represent you.  And that's unfortunate from my standpoint because we were ready to proceed to trial.  I was going to send your case out. [¶]  But now, because of that – if you have funds to hire another private attorney, that's fine.  If you don't, I'll have the public defender's office speak with you to see if you qualify."

The following interchange also occurred:

"The Defendant:  And I object to my attorney being removed on the basis . . . of that recording.  I think it should be declared as inadmissible and irrelevant to the issue. Because the person I was attempting to make contact with was . . . my daughter –

"Mr. Swarth:  Don't say anything more.  Don't say anything more.  Say nothing more.

"The Defendant:  Yes, sir."

      b.  *Legal principles*.

"The federal and state constitutional rights to the assistance of trial counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) include the right to representation by counsel without any conflict of interest [citation].  When a trial court knows or should know of a possible conflict of interest between a defendant and defense counsel, the court must inquire into the circumstances and take appropriate action.  [Citation.]  Such action

13

may include ascertaining whether the defendant wishes to waive the right to be represented by conflict-free counsel.  Although a trial court may refuse to accept such a waiver (*Wheat v. United States* (1988) 486 U.S. 153, 162 [108 S.Ct. 1692, 1698-1699, 100 L.Ed.2d 140]), it is not required to do so [citations]."  (*People v. McDermott* (2002) 28 Cal.4th 946, 990.)  "*Wheat* held that the trial court did not err in refusing to accept a waiver of conflict-free counsel.  A holding that a court *may* refuse to accept a waiver does not mean the court *must* do so."  (*People v. Carpenter* (1997) 15 Cal.4th 312, 376, disapproved on other grounds in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.)

"The 'essential aim' of the Sixth Amendment to the United States Constitution 'is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.'  (*Wheat v. United States*[, *supra*,] 486 U.S. [at p. 159].)  Under the federal Constitution, trial courts are allowed 'substantial latitude' in refusing a defendant's waiver of a conflict of interest.  [Citation.]  Some California courts have rejected the *Wheat* Court's 'paternalistic treatment' of defendants, concluding that the state Constitution makes a defendant 'master of his own fate.'  [Citation.]  Under *Alcocer* [*v. Superior Court* (1988) 206 Cal.App.3d 951], California law broadly protects a defendant's right to waive a conflict of interest on the part of retained counsel.  [Citations.]"  (*People v. Baylis* (2006) 139 Cal.App.4th 1054, 1070.)

*Alcocer* had reasoned:  "A court abridges a defendant's right to counsel when it removes retained defense counsel in the face of a defendant's willingness to make an informed and intelligent waiver of his right to be represented by conflict-free counsel.  [¶] California decisions 'limit *severely* the judge's discretion to intrude on defendant's choice of counsel in order to eliminate potential conflicts, ensure adequate representation, or serve judicial convenience.'  [Citation.]  We have stated that the right to assistance of counsel includes 'the right of an accused to be aided by [the] effective assistance of

14

counsel of his own choosing at all critical stages of criminal proceedings.' [Citation.]" (*Alcocer v. Superior Court, supra,* 206 Cal.App.3d at p. 957.)**[6]**

        c. *Discussion.*

Citing *Alcocer v. Superior Court, supra,* 206 Cal.App.3d 951, *People v. Burrows* (1990) 220 Cal.App.3d 116, and *Vangsness v. Superior Court* (1984) 159 Cal.App.3d 1087, Austin contends the trial court erred by relieving Swarth without giving Austin "the option of waiving the conflict of interest created by the recorded phone calls." But, as the Attorney General correctly argues, these cases do not help Austin because, in each one, it was a party *other than defense counsel* who sought to have the defendant's chosen attorney removed. Austin does not even attempt to rebut this argument, which points up an important distinction because in his case the sole impetus for relieving Peter Swarth as defense counsel came from Swarth himself. (See *Alcocer v. Superior Court, supra,* at p. 955 [district attorney moved to recuse defense counsel for perceived conflict of interest]; *People v. Burrows, supra,* 220 Cal.App.3d at pp. 118-119 [trial court refused to let defendant substitute counsel because court believed there was conflict of interest]; *Vangsness v. Superior Court, supra,* 159 Cal.App.3d at p. 1089 [trial court relieved deputy public defender for perceived conflict of interest after public defender "refused to remove himself without a court order"].)

---

**[6]**    The California Supreme Court has not yet taken a position on the rule expressed in *Alcocer.* A subsequent case, *People v. Jones* (2004) 33 Cal.4th 234, "upheld removal of a defendant's appointed counsel over defendant's objection because counsel had a conflict of interest involving a former client who may have been involved in the murder for which defendant was on trial. [Citation.] The Court questioned whether certain of its earlier decisions, offering broad protection for a defendant's right to choose counsel, were decided under the federal or state Constitutions, reasoning that if they were decided under the federal Constitution they were superseded by *Wheat.* [Citation.] Nevertheless, *Jones* declined to overrule *Alcocer,* stating '[w]e need not decide whether the state Constitution permits a defendant to insist on being represented by a *retained* attorney who has a potential conflict of interest, for here defendant's attorney was appointed by the court, not privately retained by defendant.' [Citation.]" (*People v. Bayliss, supra,* 139 Cal.App.4th at pp. 1070-1071.)

15

Austin's reliance on *People v. Bonin* (1989) 47 Cal.3d 808, and *Maxwell v. Superior Court* (1982) 30 Cal.3d 606, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, is misplaced. In *Bonin* the defendant's claim was that the trial court *failed* to protect his rights by adequately inquiring about and remedying a conflict of interest. (*People v. Bonin, supra,* at p. 837.) In *Maxwell*, the trial court erred by sua sponte recusing retained counsel because of a fee contract giving counsel the right to exploit the defendant's life story. (*Maxwell v. Superior Court, supra,* 30 Cal.3d at pp. 611-612.)

Austin does not dispute the factual basis of the Attorney General's argument, i.e., that this case is fundamentally different from the California cases honoring a defendant's choice to waive a retained counsel's conflict of interest because it was Swarth himself who asked to be relieved. Nor does Austin even address the legal implication flowing from his position, to wit, that a criminal defendant might have the right to force retained counsel to continue a representation counsel believes will prejudice the defendant's interests. Austin has presented no authority or reasoned argument to support this notion that his constitutional right to counsel gave him the power to force Swarth to represent him despite Swarth's professional opinion this would ultimately harm Austin.[7]

The trial court did not err by relieving Austin's retained counsel at counsel's request.

2. *Evidence of the pretext phone calls was properly admitted*.

Austin contends the trial court erred by denying his motion to exclude evidence of C.L.'s two telephone pretext calls. He claims the pretext calls, during which he made

---

[7]    Austin suggests the prosecution was acting in bad faith during these pretrial proceedings: "[A] concern is raised that the prosecutor's late disclosure of the jailhouse phone calls was at least partially designed to prompt the disqualification of Austin's retained counsel. This unfortunate and troubling possibility is further enhanced by the fact that the audiotapes were ultimately not played at trial and the phone conversations were otherwise never mentioned again." But the prosecution might have had any number of reasons for keeping the recordings out of evidence, for instance because C.L. testified and she gave very strong evidence against Austin.

inculpatory statements, violated *Massiah v. United States* (1964) 377 U.S. 201 [84 S.Ct. 1199], because adversarial criminal proceedings had already been initiated. This claim is meritless.

      a. *Legal principles.*

The Sixth Amendment right to counsel "does not attach until the initiation of adversary judicial proceedings," " 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' [Citation.]" (*United States v. Gouveia* (1984) 467 U.S. 180, 188 [104 S.Ct. 2292].) In *Massiah v. United States, supra,* 377 U.S. at pp. 206-207, the Supreme Court "held that once an adversarial criminal proceeding has been initiated against the accused, and the constitutional right to the assistance of counsel has attached, any incriminating statement the government deliberately elicits from the accused in the absence of counsel is inadmissible at trial against that defendant. [Citations.]" (*In re Neely* (1993) 6 Cal.4th 901, 915.) The initiation of adversarial proceedings requires more than the mere fact "that the defendant has become the focus of the underlying criminal investigation." (*People v. Clair* (1992) 2 Cal.4th 629, 657.)

      b. *Background.*

The trial court held two hearings on Austin's motion to have the pretext calls suppressed. At the first hearing, Detective Simmons testified he first met Austin on May 12, 2009, at the police station after Austin's initial arrest. Simmons testified he gave Austin a *Miranda* warning.[8] After some conversation, Austin invoked his right to remain silent. That same day, Austin made bail and was released from jail.[9] Simmons testified he first spoke to C.L. the following day, May 13. On May 26, Simmons had C.L. make

---

[8]    *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602].

[9]    The record indicates Austin was released on $75,000 bail on May 12, 2009, but subsequently remanded to custody later that year. A minute order dated January 19, 2010, shows Austin being remanded to custody following a court hearing with bail set at $1,000,000. By April 6, 2010, bail had apparently been reduced to $100,000, but Austin was still in custody.

the pretext calls.  At that time, he had not yet asked the district attorney to initiate a prosecution.  The criminal complaint was filed on June 1, 2009.

At this first hearing, Austin did not move for suppression on *Massiah* grounds.  Instead, he argued that because he had invoked his *Miranda* rights on May 12, the pretext calls on May 26 were essentially part of the same conversation and, therefore illegal.  The trial court refused to suppress the pretext calls on *Miranda* grounds.

At the second hearing on the suppression motion, Austin relied on *Massiah*, arguing:  "Our position is that the imposition of a bail starts the proceedings.  And that when [Austin] was arrested, specific charges were attached to him that required a specific bail.  That was the beginning of the judicial proceedings.  [¶]  My client is described in the bail receipt as a defendant, not a suspect.  He is with [*sic*] a specific return to court date and a specific bail amount and a specific charge.  [¶]  Therefore, *it is our position that proceedings began upon his arrest and the filing of charges by the police*." (Italics added.)  "Our assertion is that . . . *arrest with an assignment of a bail amount corresponding to specific charges instituted judicial proceedings*, and my client's Sixth Amendment rights attached at that point . . . ."  (Italics added.)

The trial court again refused to suppress the pretext calls "for the reasons asserted by the People and the lack of specific authority [for] the proposition that criminal proceedings begin at the time suggested by the defense."

c. *Discussion*.

Citing *Rothgery v. Gillespie County* (2008) 554 U.S. 191 [128 S.Ct. 2578], Austin argues his "release on bail should be recognized as the de facto commencement of adversarial judicial proceedings despite the fact that a formal criminal complaint was not filed until several weeks later."  "Under the holding in *Rothgery,* Austin's release on bail following his arrest . . . should be construed as the initiation of formal judicial proceedings since Austin's liberty had been subject to restriction upon his arrest, and it was apparent that the investigative stage of the case had concluded and legal proceedings were set in motion.  Though Austin had not yet made a formal appearance in court and the complaint had not yet been filed, it is obvious from his release on bail that he was a

18

defendant in a criminal proceeding.  At the point of the pretext phone call, the prosecution knew that Austin was the perpetrator of the alleged offenses and the nature and extent of those crimes was also known to the prosecution through the statements of the complaining witness.  No other information was needed for the prosecution to proceed with criminal charges against Austin. . . .  The investigative phase of the case had concluded, and its prosecution had commenced.”

But Austin’s reliance on *Rothgery* is misplaced because what that case actually said was:  “*The Sixth Amendment right of the ‘accused’ to assistance of counsel in ‘all criminal prosecutions’ is limited by its terms:  ‘it does not attach until a prosecution is commenced.*’  [Citations.]  We have, for purposes of the right to counsel, pegged commencement to ‘ “the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.” ’ [Citation.]  The rule is not ‘mere formalism,’ but a recognition of the point at which ‘the government has committed itself to prosecute,’ ‘the adverse positions of government and defendant have solidified,’ and the accused ‘finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.’  [Citation.]”  (*Rothgery v. Gillespie County, supra,* 554 U.S. at p. 198, fn. omitted, italics added.)

We agree with the Attorney General that Austin’s Sixth Amendment rights were not violated because the pretext calls occurred *before* he was brought before a judicial officer.

The interplay of pretext telephone calls evidence and the rule of *Massiah* was addressed by *People v. Riskin* (2006) 143 Cal.App.4th 234:  “As to his right to counsel, Riskin correctly notes that *Massiah* . . . prohibits the admission of evidence that law enforcement secures in violation of the accused’s constitutional right to counsel.  Equally correctly, the Attorney General notes that Riskin’s daughter made her pretext call . . . eight days *before* the district attorney’s office filed a criminal complaint and arraigned him . . . .  A long line of United States Supreme Court constitutional case law firmly establishes that ‘the right to counsel attaches only at or after the initiation of adversary

19

judicial proceedings against the defendant' [citation] ' "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment" ' [citations]. Since Riskin's statements to his daughter *antedated* the attachment of his constitutional right to counsel, *Massiah* offers him no solace." (*Id.* at p. 243.)

Although *Riskin* was decided two years before *Rothgery*, Austin points to nothing in the later case that calls *Riskin*'s reasoning into question. *Rothgery* stated: "[W]e have twice held that the right to counsel attaches at the initial appearance *before a judicial officer* [citations]," and "Rothgery was taken before a magistrate, informed of the formal accusation against him, and sent to jail until he posted bail. [Citation.]" (*Rothgery v. Gillespie County, supra,* 554 U.S. at p. 199, italics added, fn. omitted.) Reiterating that "the first formal proceeding is the point of attachment," (*id.* at p. 203), *Rothgery* explained: "[A]n attachment rule that turned on determining the moment of a prosecutor's first involvement would be 'wholly unworkable and impossible to administer,' [citation], guaranteed to bog the courts down in prying enquiries into the communication between police (who are routinely present at defendants' first appearances) and the State's attorneys (who are not) [citation]." (*Id.* at p. 206.) "We merely reaffirm what we have held before and what an overwhelming majority of American jurisdictions understand in practice: *a criminal defendant's initial appearance before a judicial officer*, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." (*Id.* at p. 213, italics added.)

Austin notes that "[u]nder California law, a defendant may be released on bail without appearing before a magistrate, judge or other judicial officer. Penal Code section 1269b, subdivision (a)[10] expressly grants police officers, sheriffs, court clerks and

---

[10]     Section 1269b provides, in pertinent part: "(a) The officer in charge of a jail in which an arrested person is held in custody, an officer of a sheriff's department or police department of a city who is in charge of a jail or is employed at a fixed police or sheriff's facility and is acting under an agreement with the agency that keeps the jail in which an arrested person is held in custody, an employee of a sheriff's department or police department of a city who is assigned by the department to collect bail, the clerk of the

officers in charge of jail facilities the power to approve and accept bail in the amount fixed in the warrant of arrest or pursuant to a bail schedule. Upon receipt of bail, this person is also authorized to issue and sign an order releasing the arrested person and to set a date and time for his or her appearance in court." Austin asserts this statute allows for a kind of substitute or de facto initiation of adversary judicial proceedings.

Austin argues section 1269b "effectively allows a person who has been arrested to be released on bail without appearing formally in court before a judge or other judicial officer. However, the effect is the same as if such an appearance had been made and bail had been set by a judicial officer." He argues that although he "did not appear before a magistrate or judicial officer prior to his release on bail, he had been arrested and had been ordered to appear at a subsequent court hearing. Though the complaint had not yet been filed, it is obvious from Austin's arrest and release on bail that he was a defendant in a criminal proceeding. By the time the pretext phone call had been made, the investigative stage of the case had largely been completed since law enforcement knew of the nature and extent of the purported crimes and that Austin was the alleged perpetrator. In sum, no additional information was required for the prosecution to proceed with criminal charges against Austin. It was presumably for this reason that Austin was

---

superior court of the county in which the offense was alleged to have been committed, and the clerk of the superior court in which the case against the defendant is pending may approve and accept bail in the amount fixed by the warrant of arrest, schedule of bail, or order admitting to bail in cash or surety bond executed by a certified, admitted surety insurer as provided in the Insurance Code, to issue and sign an order for the release of the arrested person, and to set a time and place for the appearance of the arrested person before the appropriate court and give notice thereof. [¶] (b) If a defendant has appeared before a judge of the court on the charge contained in the complaint, indictment, or information, the bail shall be in the amount fixed by the judge at the time of the appearance. If that appearance has not been made, the bail shall be in the amount fixed in the warrant of arrest or, if no warrant of arrest has been issued, the amount of bail shall be pursuant to the uniform countywide schedule of bail for the county in which the defendant is required to appear, previously fixed and approved as provided in subdivisions (c) and (d)."

arrested . . . . In short, the investigative phase of the case had concluded, and upon Austin's release on bail with an order to appear, prosecution had commenced."

The Attorney General contests Austin's argument both factually and legally. Factually: "Detective Simmons did not even speak with C.L. until May 13, 2009, after appellant was released on bail. Clearly, appellant was released from custody before any substantive investigation had even begun. Detective Simmons was still in an investigative mode when C.L. made the pretext phone calls. He had no idea what appellant might say." And legally: "In the face of the substantial body of law that clearly defines adversary judicial criminal proceedings and discounts actions, such as search warrants and extradition, that merely entail tangential judicial involvement, appellant asserts, without any supporting authority, that being released on bail, with *no* judicial involvement, is the equivalent to the initiation of adversarial judicial proceedings through formal charges, preliminary hearing, indictment, information, or arraignment." We agree with the Attorney General.

In *People v. Woods* (2004) 120 Cal.App.4th 929, police tried to implicate the defendant in a murder conspiracy by having another perpetrator secretly record a conversation with the defendant at a Los Angeles delicatessen. This led to a *Massiah* claim: "Woods . . . argues the police violated his right to counsel under *Massiah* . . . by using Amos to elicit incriminating statements from him at the deli. Although formal charges had not been brought against Woods at that time, the police had the deli surrounded and they were in the process of serving search warrants at Woods's clubs and residence. In Woods's opinion, this means the case had shifted from investigation to accusation, thereby triggering his right to counsel." (*Id.* at p. 939.)

The *Woods* court rejected appellant's argument: "[A] few courts have held open the possibility that a case could shift from investigation to accusation before the filing of formal charges. [Citations.] But the United States Supreme Court has never given credence to this view, and in 'determin[ing] when Sixth Amendment rights attach, the California Supreme Court follows the holdings of the United States Supreme Court.' [Citation.] Thus far, the Supreme Court has recognized attachment of the right to counsel

22

only 'after the first formal charging proceeding.' [Citations.] [¶] But even if there were still fluidity in the law on this issue, our holding would be the same. It is clear to us the prosecution was still at the investigatory, factfinding stage when it enlisted Amos to talk with Woods. True, Amos was trying to elicit incriminating statements from Woods, but that's precisely what the police do when they are trying to make a case against a suspect through means of an interrogation." (*People v. Woods, supra,* 120 Cal.App.4th at p. 940.) "Despite the secret recording of Woods, the search warrants, and the police presence at the deli, we hold there was no Sixth Amendment violation in this case." (*Id.* at p. 941.)

The reasoning in *Woods* applies to this case as well. Austin did not make any appearance before a judicial officer, which is the sine qua non of the United States Supreme Court's bright line rule for attachment of the Sixth Amendment right to counsel. (See *United States v. Gouveia, supra,* 467 U.S. at p. 187 [Sixth Amendment rights of prisoners, accused of murdering fellow inmate and held in administrative detention before indictments handed down, were not violated because "our cases have long recognized that the right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant"]; *United States v. Morriss* (8th Cir. 2008) 531 F.3d 591, 594 ["Morriss argues, in effect, that we should abandon the bright-line rule the Court unambiguously reaffirmed in *Rothgery* requiring appearance before a judicial officer and adopt a more flexible approach based upon a case-by-case examination of the prosecutors' and/or investigators' actions. *Rothgery* . . . clearly requires that we reject such an argument."].)

Moreover, just as in *Woods*, even if *Rothgery* had set forth a fluid, case-by-case rule, rather than a bright-line rule, Austin's contention would still be meritless because it is clear "the prosecution was still in the investigatory, factfinding stage" when his incriminating statements were elicited. (*People v. Woods, supra,* 120 Cal.App.4th at p. 940.)

The trial court did not err by denying Austin's motion to suppress evidence of C.L.'s pretext calls.

3. *Trial court properly responded to jury question during deliberations.*

Austin contends the trial court did not properly respond to a jury question during deliberations because it failed to provide additional instructions on the meaning of CALCRIM No. 1015 (elements of consent defense to sexual assault charge). This claim is meritless.

a. *Background.*

The jury had been instructed with CALCRIM No. 1015 that Austin would not be guilty of forcible oral copulation if he "actually and reasonably" believed C.L. had consented to the acts.[11] During deliberations, the jury sent out the following note: "Instruction 1015 'the defendant must actually and reasonably believe . . .' [¶] Do we need to see this as 'Is the defendant a reasonable person' or 'Was his thought regarding consent reasonable'?"

Defense counsel argued "the jury should just be instructed to reread the instruction. I think the instruction is clear. I think the problem is once we start giving them instructions on what the instruction means we run into problems of appellate issues." The following colloquy then occurred:

"[The prosecutor]: I guess the alternative to that, if it's not clear to the jury, would be permission to reargue just that one issue.

"[Defense counsel]: I don't think we should reargue.

"The Court: I am not inclined to permit you to reargue that one issue. You both focused on it in your closing arguments. [¶] . . . [¶] . . . [T]here is some case law talking about what reasonable consent is, but I am not prepared at this time to give a pinpoint instruction on what reasonable belief is. [¶] I . . . am inclined to write on the note 'Please refer to CALCRIM jury instruction 1015 for the definition of reasonable belief.' "

---

[11] The trial court instructed: "The defendant is not guilty of forcible oral copulation if he actually and reasonably believed that the other person consented to the act. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the person consented. If the People have not met this burden, you must find the defendant not guilty."

24

Alternatively, the trial court proposed rereading the instruction to the jury, but said it was reluctant to do so "because they have the instructions." Defense counsel agreed with the trial court, but the prosecutor asked to have the instruction reread and this is what the trial court did. The court reread the instructions setting out the elements of forcible oral copulation, defining "consent" and "duress," and requiring the People to prove beyond a reasonable doubt that Austin "did not actually and reasonably believe that the person consented."

b. *Discussion*.

Austin complains that in the face of "the jury's specific question on the meaning of reasonable belief in consent, the trial court simply re-read the CALCRIM No. 1015 instruction that the jurors had obviously found of little assistance." He argues "the trial court should have explained . . . the issue was not whether Austin was a reasonable person but rather whether his thoughts or beliefs concerning consent were reasonable under the circumstances of the case. . . . [I]t was important that the jurors understood that reasonable belief did not mean that they had to find that Austin was a reasonable person." We conclude there was no error here.

Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." "The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. *Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky.* [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97, italics added.)

25

As the Attorney General points out, Austin waived this issue when defense counsel argued to the trial court that CALCRIM No. 1015 was "clear," the subject did not need to be reargued, and the jurors should just be told "to reread the instruction." (See *People v. Castaneda* (2011) 51 Cal.4th 1292, 1352 [defendant waived claim by agreeing with trial court's choice of appropriate response to jury question]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 ["Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived."]; *People v. Kageler* (1973) 32 Cal.App.3d 738, 745-746 [failure to object when trial court answers jury question may be construed as tacit approval and waives issue for appeal].)

But even had the issue been preserved, we cannot see there was any error. Austin argues: "By failing to directly answer the jury's question, the trial court permitted the jurors to base their determination of reasonable belief in consent on their resolution of the false question of whether Austin was a reasonable person. . . . However, the correct issue for the jury was not whether Austin was a reasonable person but whether his belief in C.L.'s consent was reasonable." But CALCRIM No. 1015 did not require the jury to find that Austin was generally a reasonable person; rather, the instruction specifically asked whether Austin "actually and reasonably believed" C.L. had consented to oral copulation. The instruction is clear.[12]

The trial court did not err in its response to the jury question.

4. *Trial court did not give erroneous jury instruction regarding expert testimony.*

The trial court instructed the jurors with CALCRIM No. 1193 to explain how they should consider the expert testimony about CSAAS:

---

[12]    Moreover, Austin is ignoring the fact the jury was also instructed *the prosecution* had the burden of proof on this issue. Hence, under Austin's scenario, the People would have had to prove he did not actually believe C.L. had consented *and* he was not generally a reasonable person.

26

"You have heard testimony from Joyce Medley regarding child sexual abuse accommodation syndrome.

"Joyce Medley's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

"You may consider this evidence only in deciding whether or not . . . C.L.'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

Austin contends the instruction was erroneous. This claim is meritless.

### a. *Legal principles.*

The admissibility of CSAAS testimony is well-settled. "In a series of decisions the Courts of Appeal have [held that] . . . expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is [however] admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident – e.g., a delay in reporting – is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301, fn. omitted.)

"Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation. [Citations.] [¶] Admission of evidence such as CSAAS is not error merely because it was introduced as part of the prosecution's case-in-chief rather than in rebuttal. The testimony is pertinent and admissible if an issue has been raised as to the victim's credibility. [Citations.]" (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.)

b. *Discussion.*

C.L.'s credibility was clearly in dispute. The entire case revolved around the issue of whether she had consented to the acts of oral copulation and engaged in them voluntarily, or whether her participation had been coerced by means of force or duress.

It appears from the record that a period of approximately six months elapsed between the time Austin first orally copulated C.L. and when she finally told her martial arts instructor about it. This delay in reporting placed her credibility at issue. (See, e.g., *People v. Patino, supra,* 26 Cal.App.4th at p. 1745 [expert's "testimony was offered for the limited purpose of explaining why Dorena did not immediately inform anyone of her molestation and why she slowly revealed the details"]; *People v. Housley* (1992) 6 Cal.App.4th 947, 955 ["In this case Dr. Schuman's testimony was clearly intended to help explain Maryella's delay in reporting the abuse and her last-minute recantation of the charges. Under these circumstances expert psychological testimony may be used to aid the jury's assessment of the victim's behavior."].)

Austin complains CALCRIM No. 1193 "effectively . . . permits the jurors to consider this expert testimony as supportive of the truth of the allegations made against the defendant." But it must have been clear to the jury the prosecution expert knew nothing specific about this case. Medley testified she had never met C.L. and the *only* thing she knew about the case was that it involved a stepfather and his teenaged stepdaughter. (See *People v. Housley, supra,* 6 Cal.App.4th at p. 954 ["Dr. Schuman plainly testified she had never met Maryella, was unfamiliar with the details of the case and had never read any reports associated with this matter. This testimony made clear the fact that the doctor was merely explaining behavior common to sexual abuse victims, and was not offering an opinion on Maryella's credibility."].)

The expert testimony here did no more than inform the jury that certain circumstances, e.g., a delay in reporting the sexual assaults, are not necessarily indicative of fabrication. C.L. testified: "[I] never considered telling my mom . . . because I was so scared of what she would do, because what [Austin] had told me. [¶] And then I considered telling other people, but like I knew that my mom was the last person to tell,

28

because she will get like really upset, . . . but telling other people – not while that was happening. [¶] Like seriously, I was thinking that maybe . . . when I got older, when I turned 18 . . . I can move out and move away from this so I don't have to deal with it anymore." C.L. testified she was embarrassed and ashamed about the sexual encounters with Austin: "Because I wouldn't know how other people will think of me, because at the time he made me think that it was my fault." C.L. testified to feeling hopeless and helpless. By the time she told Moore what had been going on, she was feeling suicidal.

Medley explained there were five potential factors involved in Child Sexual Abuse Accommodation Syndrome: secrecy, helplessness, entrapment and accommodation, delayed or unconvincing disclosure, and retraction. She testified:

"Q. . . . Having that in mind, an ongoing sexual assault . . . do children who are sexually abused usually tell right away?

"A. No.

"Q. And why is that?

"A. One is frequently they are afraid. They may be afraid they're not going to be believed. They may be thinking that if they do so, the family might be hurt in some way. They're fearful of being held responsible and they're confused."

Counsel's examination of Medley continued:

"Q. [¶] Based on your practice, your private practice with 40 percent of your clientele since 1986, being investigation of sexual assault, out of all those people, how common is it for them to delay reporting of sexual abuse?

"A. It is extremely common. The majority of the victims that I have worked with have delayed reporting.

"Q. Okay. [¶] For substantial periods of time, like weeks, months?

"A. Years, decades."

"Q. If a child does not disclose and . . . has a fear of being blamed or held responsible, does that . . . mean that they're a willing participant in the relationship?

"A. No.

"Q. Why not?

29

"A. The accommodation part is that they're participating and it's under duress."

"Q. So . . . what would you consider delayed disclosure?

"A. Ideally, if there is a sexual assault the child . . . would go to the primary caretaker immediately and report, or some other trusted adult. [¶] A delayed report can be anywhere from a week later, which is delayed, or it can be 20 years later. [¶] If we are talking about adolescents, then you're looking at the delay can go for years and years."

The trial court did not err by instructing the jury with CALCRIM No. 1193, which correctly advised how to evaluate the expert's CSAAS testimony.]]

**[[End nonpublished portion]]**

5. *Expert was qualified to offer sexual response opinion.*

Austin contends the prosecution expert lacked the professional qualifications to testify C.L. could have experienced an orgasm during non-consensual oral copulation. This claim is meritless.

a. *Background.*

The background to C.L.'s testimony about having experienced orgasms during the acts of oral copulation is the following.

After the jury was selected, but prior to opening statements, the prosecutor noted that at the preliminary hearing C.L. had testified she experienced an orgasm during the oral copulation. The prosecutor said, "I am not going to be asking the victim [about] her . . . physiological response to any of the sex acts. [¶] I just want to make sure that this question is not asked by [defense counsel] in front of the jury without first approaching. I just think, based on the nature of the conflict here and defense's position that this was inappropriate, but consensual contact. My position is it was duress. [¶] So any mention of her physiological response to anything is not relevant . . . and . . . would be very prejudicial . . . ."

The following colloquy then occurred:

"[Defense counsel]: Your Honor, I disagree strongly. [¶] Your Honor, we are saying this was consensual. I don't want to become too graphic, but I do think it's very relevant if somebody enjoys a sexual encounter to determine whether or not it was consensual or not.

"The Court: Wait a minute. [¶] Enjoying a sexual encounter is different than a physiological response. [¶] And . . . you are saying that if she has an orgasm that that ipso facto means that it was consensual, because all orgasms are pleasurable?

"[Defense counsel]: No. [¶] What I'm saying . . . . it's relevant. I am saying it's relevant evidence as to whether this was consensual. [¶] I believe as a man of 53 years-old that when people want to engage in sex . . . it is more likely or not that they do achieve orgasm. I believe when they do not want to engage in sex that it tends to follow that they do not achieve orgasm. [¶] I believe that is very relevant to the issue of consensuality, and this is evidence that came out of the victim's mouth, and I really think that we are entitled to go into that.

"The Court: Well, notwithstanding your 53 years of experience as a man . . . I do not know that you're qualified to render that opinion. [¶] What you're saying is that every time a rape victim has an orgasm that it's circumstantial evidence of consent. That's what you're saying.

"[Defense counsel]: I think it could be, Your Honor."

The trial court responded: "I disagree with you. I think it's a physiological response. I think you're going to be permitted to ask her whether or not she enjoyed it, whether or not she consented to it. You can explore the circumstances of that. [¶] But the fact that she achieved an orgasm is not relevant to whether or not she was under duress. . . . [¶] I am balancing the factors under [Evidence Code, section] 352. It does have probative value, but it is unfairly prejudicial."

31

This ruling by the trial court was not unreasonable. In *Curtis v. State* (1976) 223 S.E.2d 721, 723, the Georgia Supreme Court ruled, in a rape case: "The trial court did not err in refusing to allow Curtis' attorney to ask the prosecutrix whether she experienced orgasm during these acts of intercourse; the answer would have been legally irrelevant to the issue of consent."

However, during the course of C.L.'s trial testimony, the trial court reversed itself and decided the defense should be allowed to ask if C.L. had experienced orgasms during the incidents. That was because during her opening statement to the jury, the prosecutor, while describing the pretext telephone calls, said: "And C.L. said to the defendant 'Why did you do this to me? You have ruined my life,' along those lines. [¶] And the response from the defendant . . . was 'I thought you wanted this. I misread the communications. I wanted you to know what it felt like to have an orgasm.' "

The trial court reasoned the prosecutor's remarks had opened the door to allowing defense counsel to explore the issue: "[T]he basis of C.L.'s testimony and the statement in opening statement about what the defendant said about the orgasm opens the door to putting in whether or not C.L. had an orgasm. [¶] As I understand it, there is some evidence that Mr. Austin said 'I thought she wanted – I thought it was consensual. I wanted her to experience an orgasm.' [¶] The fact that she then does have an orgasm, then to exclude that would be misleading in this case."

Then, during cross-examination, defense counsel asked C.L. if she had experienced an orgasm during the oral copulations. The trial court overruled the prosecutor's objection to the question, and C.L. testified that she had experienced an orgasm each of the four times Austin orally copulated her. C.L. also testified she did not enjoy these orgasms.

Thereafter, the prosecution's CSAAS expert, Joyce Medley, testified: "[A]ny human body is designed to respond to sexual stimulation . . . . The female clitoris has 8,000 nerve endings as opposed to the male penis, which only has 4,000. So the design is there. [¶] If sex didn't feel good, people wouldn't do it, and nature doesn't want that. That's the effective end of the human race. [¶] So the body is designed for stimulation.

32

[¶] It's not always connected to the brain, which may or may not have different thoughts about it. It is a purely physiological reaction, and if the clitoris gets enough stimulation, there will be an orgasm."

In response to the question, "[C]an children have a physiological response in that they have experienced an orgasm during a sexual abuse instance?," Medley answered, "Yes." At this point, defense counsel objected on lack of foundation grounds. The objection was overruled and the following colloquy occurred:

"Q. By [the prosecutor]: And why is that?

"A. The body is designed to respond sexually.

"Q. Is there some sort of disconnect or something between the brain and the body . . . .

"A. Yes. Frequently during sexual activity there can be a dissociation. The brain can go elsewhere, but the clitoris is right there."

b. *Discussion*.

Austin contends Medley was not qualified to give this testimony because she "is not a physician and has no medical training to speak of," and because her "testimony went far beyond her proposed area of expertise which was child sexual abuse accommodation syndrome." Austin argues he was prejudiced by the admission of this expert testimony because it detracted from his "reasonable belief in her consent" defense: "While C.L.'s orgasmic response may not qualify as retroactive consent, it did serve as circumstantial evidence from which an inference could be raised that C.L.'s initial submission to Austin's acts of oral copulation was either consensual, or more pertinently, gave the appearance of consent, so that Austin had a reasonable belief in C.L.'s consent. Indeed, that C.L. experienced orgasm during the first act of oral copulation was certainly an indication from which Austin could base a belief that, when C.L. subsequently submitted to oral copulation, she was doing so voluntarily in order to achieve further sexual satisfaction."

33

We conclude the trial court did not err by allowing this expert testimony.

" 'A person is qualified to testify as an expert if [she] has special knowledge, skill, experience, training, or education sufficient to qualify [her] as an expert on the subject to which [her] testimony relates.' (Evid. Code, § 720, subd. (a).) ' "The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown." ' [Citation.]" (*People v. Davenport* (1995) 11 Cal.4th 1171, 1207, disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) "A claim that expert opinion evidence improperly has been admitted is reviewed on appeal for abuse of discretion. [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 131.

Medley testified she was a Licensed Marriage and Family Therapist, a tenured, part-time professor at California State University, Northridge, and "clinical supervisor at the Valley Trauma Center, which is the sexual assault treatment center affiliated with the university's Department of Education[al] Psychology." As part of her college and graduate-level training, Medley "began to specialize in the area of post-traumatic stress disorder as it relates to victims of sexual assault and other single incident traumatic incidents. [¶] My post graduate training, I did a four year internship at the Rape and Sexual Abuse Center of Ventura County. Since that time I have specialized in the treatment of sexual assault. [¶] I have a broad based practice, but about 40 percent of my practice is related to sexual assault, and about 85 percent of that I work with children, adolescent females who are victims of sexual assault."

Medley testified she had received training in human sexuality "[w]ith part of my undergraduate degree program, part of my . . . master's degree and also as post graduate training. [¶] In addition, I've had 25 years experience of working with sexual assault survivors." Asked about her background, training and experience in relation to "adolescent female[s] . . . and the physiological responses to sex in general," Medley answered: "My undergrad classes and my graduate classes in human sexual behavior dealt a lot on [*sic*] the biology and physiology of sexual response," and "[my] post graduate training has also delved into that."

34

Austin complains Medley "is not a psychiatrist nor a physician. And yet, she was permitted to testify, not simply to the biomechanics of female sexual response but to the much more psychologically and physiologically nuanced question of whether and how a sexual assault victim may experience an orgasmic response despite the physical stimuli being provided against her will." He asserts, "Medley had done no studies on this subject, nor did she provide any testimony that she had read or known of any studies in the field," and that "[g]eneral training in human physiology or even female sexual anatomy is inadequate for an opinion on the subject of sexual assault victims' physiological response."

But Austin does not apparently know whether Medley conducted studies in the area because that never came up during her testimony. Nor was she asked if she was familiar with studies done by others. Moreover, Austin has not demonstrated that either factor was necessary for Medley to be qualified to give the testimony she did. Austin had the opportunity at trial to question Medley about her qualifications, but he declined to do so. As the Attorney General points out, Austin is simply making a naked assertion about Medleys qualifications.

Austin's reliance on *People v. Davenport, supra,* 11 Cal.4th 1171, and *People v. Fierro* (1991) 1 Cal.4th 173, in support of his claim is unwarranted. In *Davenport*, a former police officer tried to offer his opinion as to whether the victim had been impaled by a stake before or after dying. The trial court properly excluded this proposed testimony because the witness "lacked the qualifications necessary to render such an opinion. He had no medical, serology, or pathology training. He had viewed only eight corpses in the two years he had been a homicide investigator, none of which involved a similar injury. He also had only a limited understanding of the manner in which the cause and time of death is clinically determined." (*People v. Davenport, supra,* at p. 1207.)

*Fierro* held the trial court did not abuse its discretion in limiting a witness's testimony to ballistic evidence where the witness "had no training or background in pathology and never had previously testified as an expert in the field; [and] had never

35

examined a bullet wound microscopically, conducted tests to determine the effects of a bullet on the human body or removed a bullet from a human body." (*People v. Fierro, supra,* 1 Cal.4th at p. 224.) "The trial court allowed Duncan to testify as a ballistics expert based on his previous experience examining spent projectiles, but determined that Duncan was not qualified to give medical testimony concerning the nature of the victim's injuries or the trajectory pattern of the bullet. [¶] Although one need not necessarily be a licensed physician to give a medical opinion [citation], here it is evident that Duncan was totally deficient in the requisite background, training or experience to state an opinion on the nature or cause of the victim's wounds." (*Ibid.*)

In contrast to these cases, Medley had 25 years' experience working with sexual assault victims, particularly with adolescent girls. She was a part-time professor and the clinical supervisor of a sexual assault trauma center. Medley testified she had received training in human sexual behavior, with specific emphasis on "the biology and physiology of sexual response." Austin has failed to offer either case authority or reasoned argument to show why the trial court abused its discretion by allowing Medley to testify about this subject.

We conclude the trial court did not abuse its discretion by admitting this expert testimony. (See *People v. Catlin, supra,* 26 Cal.4th at p. 131.)

**[[Begin nonpublished portion]]**

[[6. *The prosecutor did not commit misconduct by personally denigrating Austin.*

Austin contends the prosecutor committed misconduct during closing argument by characterizing him as a monster with a sick, twisted and perverted mind. This claim is meritless.

a. *Background.*

When Detective Simmons interrogated Austin, he tried to provoke an incriminating response by posing a "monsters" versus "mistakes" dichotomy: "I deal with sexual abuse and physical abuse of children. . . . [B]ut I deal with two different types of people, usually. I mean, I've got your hard core just monster predators . . . that sit by the elementary school in the van and wait for the time to snatch up a kid and . . .

36

they're evil. . . . [¶] But then I deal with people that, for whatever reason – and there's usually a reason for it, and we get to the bottom of that, but it's – people just made a mistake. And what I'm trying to figure out is, if this is one of those case[s], to where, maybe, a mistake was made. Maybe there was poor judgment. I don't know. Maybe it was a misplaced sexual urge. Maybe – your wife's out of town, and . . . guys have dreams; whatever happens . . . . Sometimes, it's because of alcohol. Sometimes, it's because of stress. I don't know. But the point is, the allegations that children make . . . when there comes to be . . . some truth to them, whether it be DNA or whatever . . . the paintbrush that's used to paint the people that did it is, either the monster [or] a mistake. And . . . when people . . . start lying . . . all of a sudden, the case comes out, and DNA comes out, and it's proven that this person's just lying, well, . . . when it goes to court, they look like the monster." Later in the interview Simmons said: "Because, I mean, DNA is, like, 99.97 percent accurate. . . . I don't want . . . the court to say, 'Well, obviously, he sat there and lied. He's one of them.' "

At trial, Simmons testified he used this ploy to convince a suspect "there's two types of people that commit these types of crimes; there is your hardcore pedophile or monsters [*sic*], and then you have people that just legitimately screwed up for whatever reason."

When it came to closing argument, it was defense counsel who first referenced this portion of Simmons's testimony. Defense counsel argued that, although Austin was guilty of child molesting, he had never forced C.L. to do anything: "Now . . . don't misread me. I am not justifying this conduct. It was deplorable, and he should be punished for that . . . . He should go to jail for having sex with a minor. [¶] But if you recall – and I don't think anybody said it better than . . . Detective Simmons . . . [who said] 'it's like the monster versus the person who has misplaced sexual urges.' [¶] And he talks about that monster . . . . He said 'That monster, that guy who sits around the school yard, who kidnaps these kids, these hardcore [pedophiles].' [¶] Well, we know that's not [Austin]. We know he is 68 years old. This is his first brush with the criminal justice system." Counsel continued: "Although [the sexual contact between Austin and

37

C.L.] was sick, although it was twisted and perverted, it was not forced.  He is not that monster.  [¶]  You saw his daughter.  You know . . . he's not been arrested before.  He is not that monster."  "This is not a force case.  He is not a monster.  He has been a productive citizen and a good father up until the time he became involved in this twisted relationship, this twisted and dysfunctional relationship."

Austin's closing argument ended at this point.  The prosecutor began her rebuttal argument by saying:  "I want to focus on some words that [defense counsel] just uttered in this courtroom to you.  It's on the record.  It's out there.  [¶]  He said this conduct was – and I quote 'totally inappropriate, sick, twisted, perverted.'  [¶]  Those were his words, not mine.  But I agree with him."  "How can [defense counsel] get up here and argue to you that the defendant reasonably believed in consent when [defense counsel's] own words were that the conduct was totally inappropriate, sick, twisted and perverted?  [¶] The defendant only in his sick, twisted and perverted mind believed there was consent.  That's not reasonable under the law, and that's not a defense.  The defendant is guilty of forcible oral copulation . . . and there is no defense.  [¶]  Furthermore, duress occurs before the sex act begins.  Duress is all the things that he does, all the manipulations that he does to get her to submit to the sex."  "These was some discussion about this is just a mistake.  Defendant is not a monster.  Detective Simmons even said monsters are those predators that go to schools and seek out little girls and do all that nasty stuff.  [¶]  But . . . you want to listen to that interview again, listen to . . . what Detective Simmons is really saying.  [¶]  What Detective Simmons is really saying is monsters lie, lie, lie, lie, and lie.  They lie to get what they want.  They lie to get out of the situation they're in. This is not a mistake.  This was purposeful.  This was intentional.  This was long lasting. This was to groom his new sex partner, 15 year-old C.L.  [¶]  He is a monster.  He is a monster and he lied and he lied and he lied."

b. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.  [Citation.]  Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." '  [Citations.]  [¶] ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)  " ' "[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom." '  [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752.) "When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of.  [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 689.)  "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

A defendant who fails to object at trial "waive[s] any error or misconduct emanating from the prosecutor's argument that could have been cured by a timely admonition." (*People v. Wrest* (1992) 3 Cal.4th 1088, 1105.) Austin did not object to the prosecutor's argument. Nevertheless, in the interests of judicial economy and to avert potential ineffective assistance of counsel claims, we will address the merits of Austin's prosecutorial misconduct claim. (See *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 310.)

          c. *Discussion*.

Austin argues "the prosecutor's attack on [him] as a monster with a 'sick, twisted and perverted' mind constituted reversible misconduct because this remark held Austin up to ridicule and opprobrium before the jury. It also served to de-humanize him in the minds of the jurors." But it was defense counsel who *initially* referred to Austin as sick, twisted and perverted, albeit as a way of relativizing his misconduct. That is, defense counsel argued Austin might be sick, twisted and perverted for having molested C.L., but he was not the kind of monster who would use force to molest a child. *In response* to this argument, the prosecutor merely agreed with defense counsel's "sick, twisted and perverted" characterization, and then asked how could such a person reasonably believe C.L. had consented to oral copulation. As for the prosecutor calling Austin a "monster," this was a direct reference to Simmons's interrogation ploy of counterposing monsters and mistakes, and warning Austin his claim of complete innocence might backfire and cause him to be seen as a monster who "lied and lied" to evade responsibility.

This portion of the prosecutor's closing argument was not improper.

7. *The prosecutor did not commit misconduct by personally vouching for C.L.*

Austin contends the prosecutor committed misconduct by improperly vouching for C.L.'s honesty during closing argument. This claim is meritless.

a. *Background*.

During closing argument, the prosecutor told the jury:

"You saw C.L. testify. [¶] And what I want to point out to you now is in looking at all the evidence, which is essentially C.L.'s testimony and the defendant's statements, his statements to Detective Simmons in his interview as well as his statements to C.L. in the pretext calls, you saw C.L. You were able to judge her . . . credibility. She never has lied. From the time she disclosed, she's always said this oral copulation happened four times. She always said that these massages occurred and they progressed, progressively got closer to her private parts. She's never lied to anyone."

Austin argues these "comments constituted prosecutorial misconduct because they amounted to vouching for the veracity of the complaining witness."

b. *Discussion*.

While a prosecutor is generally precluded from vouching for the credibility of witnesses, "[p]rosecutorial assurances, *based on the record*, regarding the apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper 'vouching,' which usually involves an attempt to bolster a witness by reference to facts *outside* the record. [Citation.]" (*People v. Medina* (1995) 11 Cal.4th 694, 757; see *People v. Stansbury* (1993) 4 Cal.4th 1017, 1059, disapproved on other grounds in *Stansbury v. California* (1994) 511 U.S. 318 ["The argument that Allen was a believable witness who had done a great deal of soul searching was a proper comment on the evidence, not an attempt on the part of the prosecutor to personally vouch for the witness's credibility."].)

Immediately following the portion of the People's closing argument cited by Austin, the prosecutor said:

"Who has lied in this case? Who has repeatedly lied?

"The defendant.

"He lied to Deputy Drake, he lied to Detective Simmons, he's lied to C.L.

"Why would you not believe her when she says she didn't consent?

"Why would you not believe her when she said she was afraid?

41

"Why would you not believe her when she said she thought she had to endure?

"She's given you no reason to disbelieve her, and the defendant has given you every reason to disbelieve him."

Read in context, it is apparent the prosecutor's argument was based on the evidence presented at trial and the jury would not have thought the prosecutor was relying on out-of-court information. As the Attorney General points out: "While the prosecutor . . . argued that C.L. did not lie, she did so in the context of [C.L.'s] testimony being consistent and proven truthful before the jury. Arguing a witness is truthful because her testimony is consistent with the evidence adduced at trial is simply arguing a permissible inference from the evidence." (See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 433 ["although the prosecutor argued Guillory was credible, she did so in the context of his being an eyewitness to the crime and argued that aspects of his testimony suggested he was telling the truth"].)

There was no improper vouching by the prosecutor.

8. *There was no cumulative error.*

Austin contends that, even if harmless individually, the cumulative effect of these claimed trial errors mandates reversal of his convictions. Because we have found no errors, his claim of cumulative error fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

9. *Trial court did not err by withholding juror identifying information.*

Austin contends the trial court erred by denying his request for personal juror identifying information without holding an evidentiary hearing on the matter. This claim is meritless.

a. *Legal principles.*

A trial court's denial of a request to disclose juror identification information is reviewed for abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317.) To demonstrate good cause for the release of juror identification information pursuant to Code of Civil Procedure section 237, subdivision (b), a defendant must "set[] forth a sufficient showing to support a reasonable belief that jury misconduct occurred . . . ."

42

(*People v. Rhodes* (1989) 212 Cal.App.3d 541, 552; accord *People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1321, fn. 8.) Furthermore, the misconduct alleged must be " 'of such a character as is likely to have influenced the verdict improperly.' " (*Id*. at p. 1322.) A request to disclose juror identifying information must be supported by more than mere speculation and may not be used as a " 'fishing expedition' by parties hoping to uncover information to invalidate the jury's verdict." (*People v. Rhodes, supra,* at p. 552.)

A trial court does not have a duty to investigate every possible instance of juror misconduct. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419.) "[W]hen a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Id*. at p. 415; see *People v. Ray* (1996) 13 Cal.4th 313, 343 ["The decision whether to investigate the possibility of juror bias, incompetence, or misconduct – like the ultimate decision to retain or discharge a juror – rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial."].) Similarly, juror identifying information may not be released simply to allow a defendant to cultivate or fortify " 'the second thoughts of a vaguely uncomfortable juror.' " (*People v. Rhodes, supra,* 212 Cal.App.3d at p. 549.)

b. *Background.*

In order to determine if there existed grounds to file a new trial motion, Austin submitted two declarations to the trial court to justify an order releasing the jurors' personal identifying information.

One declaration was from Juror No. 6, who stated: "[T]hroughout the course of the deliberations the jury refused to deliberate in an unbiased manner; instead of presuming innocence, as we were instructed, the members of the jury keep [*sic*]

43

explaining away any points made by the defense by stating he (the defendant) is a scumbag and needs to be put away. There was no intelligent discussion of the facts."

A second declaration was from a defense investigator who had interviewed Juror No. 6. Juror No. 6 told the investigator: "[T]here was an elderly woman who had mentioned her feelings of voting for a guilty [*sic*], during the trial and when she entered the jury room, mentioned something to the effect that he (client) was guilty and deserved to go to jail. Many of the other jurors, who [Juror No. 6] found were parents, agreed with her statement. [¶] During the second day of deliberation, he stated that they as a whole spent the morning discussing the trial. He tried to bring up points to deliberate on, but no other person wanted to deliberate those points and expressed their feelings of Mr. Austin being guilty to all counts/charges. [Juror No. 6] felt that some of the charges were proved, but not all of them and wanted to deliberate on those. He added that the other jurors had already made up their minds, without deliberating and did not want to discuss his concerns/questions." Juror No. 6 "added that during the jury deliberation period, he and the alternate juror were the only one's [*sic*] that voted not guilty, during their votes. He ultimately voted with the other jurors by voting guilty as he felt extremely pressured by the rest of the jurors. Many of the other jurors complained about the time being spent deliberating and expressed that they did not want to deliberate any longer. He . . . felt that the jury did not deliberate his questions/points of the defense before voting for guilty."[13]

The trial court denied Austin's request for juror identifying information: "I don't believe that the statements made by this juror rise to the level of good cause to go on a fishing expedition." The information in the juror's declaration "doesn't rise to the level of misconduct by itself or bias by itself viewed in the context of the trial with the concession that the sexual touching occurred, and . . . whether or not it was by force

---

[13]     The trial court said that, although hearsay evidence such as the defense investigator's declaration would normally not be considered in this situation, "I considered the [defense investigator's] declaration regardless."

44

was the issue.  [¶]  So I am denying the motion, finding that good cause has not been established to warrant further inquiry of juror information."

          c.  *Discussion.*

Austin contends the trial court erred by refusing to release juror identifying information after being "placed on notice of serious juror misconduct reflecting juror bias, prejudgment of the case and refusal to deliberate."  He argues the jurors revealed they were biased by referring to him as a "scumbag," determined he was guilty before jury deliberations even began, and refused to deliberate when Juror No. 6 raised questions about Austin's guilt.  We disagree.

In denying Austin's request for juror information, the trial court pointed out an unusual aspect of his trial:  during his opening statement, defense counsel conceded Austin was guilty of all the non-forcible sex charges.  As the Attorney General notes, one result of this concession was that "the jurors, having heard the defense admit unlawful sexual conduct, would understand, at least preliminarily, that appellant was 'guilty' of something. . . .  Thus, a casual comment by a juror regarding appellant's 'guilt,' has a very different meaning in this case."

The Attorney General also correctly notes that Juror No. 6's belief other jurors failed to give sufficient consideration to his pro-defense arguments constituted inadmissible evidence of his fellow jurors' mental processes.  (See *People v. Jones, supra,* 17 Cal.4th at p. 316 ["Evidence Code section 1150 . . . bars admitting evidence showing the effect of statements or events on the mental processes of a juror"].)  Likewise, Juror No. 6's statement that he only went along with the verdict because he felt pressured was inadmissible evidence of his own mental processes.  ". . . Evidence Code section 1150 ' "prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent.  The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration." [Citation.]' [Citation.]" (*People v. Engstrom* (2011) 201 Cal.App.4th 174, 184.)

45

In this case, there were no significant "objective" observations of actions taken or statements made that would warrant further investigation. Juror No. 6's complaints that the jury did not deliberate "in an unbiased manner," did not have an "intelligent discussion of the facts" and did not "want to discuss his concerns/questions", all implicate the jurors' mental processes. The references to Austin being a guilty scumbag were explainable by the fact the jury learned from Austin's opening statement, before any evidence was presented, that he was not going to contest the child molesting charges.

We conclude the trial court did not abuse its discretion by denying Austin's request for juror identifying information.

10. *Faretta request was properly denied.*

Austin contends the trial court erred by denying his post-trial request for self-representation under *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525]. This claim is meritless.

a. *Background.*

Following the jury verdict on January 27, 2011, Austin appeared with trial counsel McKesson on February 25, at which time sentencing was continued until March 24. On that date, McKesson declared a conflict of interest and the public defender was appointed to represent Austin. Austin appeared with the public defender on November 7 and sentencing was set for December 16. On December 7, Austin made a *Marsden* motion[14] seeking to replace the public defender. Following a lengthy in camera proceeding, the *Marsden* motion was denied. Once proceedings resumed in open court, Austin immediately moved for self-representation under *Faretta*. He informed the court he would not be prepared for sentencing on December 16 and that he needed a continuance. The trial court denied Austin's *Faretta* motion, calling it "a delaying tactic," "a pretext" and "not credible."

---

[14] *People v. Marsden* (1970) 2 Cal.3d 118.

b. *Legal principles.*

"A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive.  A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution.  [Citations.]  At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself.  [Citation.]  [¶] . . . [¶] . . . [U]nlike the right to be represented by counsel, the right of self-representation is not self-executing.  In *Faretta,* . . . the court held that a knowing, voluntary, and unequivocal assertion of the right of self-representation, made weeks before trial by a competent, literate defendant, should have been recognized [citation]; subsequent decisions of lower courts have required expressly that the defendant make a timely and unequivocal assertion of the right of self-representation.  [Citations.]"  (*People v. Marshall* (1997) 15 Cal.4th 1, 20-21.)

"Many courts have explained that a rule requiring the defendant's request for self-representation to be unequivocal is necessary in order to protect the courts against clever defendants who attempt to build reversible error into the record by making an equivocal request for self-representation.  Without a requirement that a request for self-representation be unequivocal, such a request could, whether granted or denied, provide a ground for reversal on appeal. . . .  [¶]  We share the concern that some assertions of the right of self-representation may be a vehicle for manipulation and abuse. . . .  The high court has instructed that *courts must draw every inference against supposing that the defendant wishes to waive the right to counsel*.  [Citation.]  It follows, as several courts have concluded, that in order to protect the fundamental constitutional right to counsel, one of the trial court's tasks when confronted with a motion for self-representation is to determine whether the defendant truly desires to represent himself or herself.  [Citations.] The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words.  *Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-*

47

*representation may support the court's decision to deny the defendant's motion.*
A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." (*People v. Marshall, supra,* 15 Cal.4th at pp. 22-23, italics added.)

        c. *Discussion.*

In this case, regardless of whether Austin's *Faretta* motion was timely, it was certainly equivocal. As Austin himself acknowledges, "[T]he *Faretta* motion was made in response to the denial of the *Marsden* motion and reflected Austin's lack of confidence in the public defender assigned to represent him." This was reason enough to deny it because a proper *Faretta* motion requires a knowing, voluntary and unequivocal assertion of the right to self-representation. (See *People v. Marshall, supra,* 15 Cal.4th at pp. 20-21.) The record shows Austin impulsively invoked *Faretta* only because the trial court denied his *Marsden* motion, not because he truly wanted to represent himself. (See *People v. Scott* (2001) 91 Cal.App.4th 1197, 1205, fn. omitted ["More importantly, the motion was not unequivocal. Scott made his *Faretta* motion *immediately after* the trial court denied his *Marsden* motion, and Scott's subsequent comments suggest he made the *Faretta* motion only because he wanted to rid himself of appointed counsel."])

The trial court properly denied Austin's request for self-representation because it was equivocal.**]]**

**[[End nonpublished portion.]]**

**DISPOSITION**

The judgment is affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION**


KLEIN, P. J.

We concur:


CROSKEY, J.


ALDRICH, J.